## UNITED STATES CIRCUIT COURT.

BENJAMIN F. TOWN, and others Owners of the Schooner
MARY C. TOWN, appellants, agt. THE STEAMSHIP WES-
TERN METROPOLIS, Benner & Brown claimants, and ap-
pellees.

In a collision between a schooner and a steamer meeting, it is the duty of the
steamer to take care and avoid the canvas in passing her, assuming that the lat-
ter kept her course. The *onus* lays on the steamer to show that the canvas did
not keep her course or was guilty of some other fault that contributed to the col-
lision.

Where it appeared that the schooner altered her course within three or four hun-
dred yards of the steamer; their direction, previous to that being nearly head on
to each other; their conjoint speed being about thirteen miles an hour; the steamer.
just previous to the alteration of the schooner's course, having blown a long blast
of her steam whistle to the canvas; the steamer being about 2,600 tons burden,
and the canvas 150 tons;

It was *held* that such alteration in the schooner's course was not a fault which
should condemn her, but was a movement made under impending danger and *in
extremis*, for which the steamer alone must be held responsible.

A master of a steamer is uninformed of his duties who says, "If two vessels,
one a steamer and the other a sailing vessel, are approaching head and head, it is
the duty of each to port, and go to the right, and that there is no distinction be
tween a steamer and a sailing vessel, and two steamers as to the duiy."

It is not surprising when taking into account the disparity in size and momentum
of the two vessels, the steamer 2,600 tons the schooner 150 tons, that the approach
to each other within 300 or 400 yards distant, which at the combined speed
of the two vessels they would meet in less than two minutes, or even in less if the
distances apart be calculated according to the statement of the wheelsman of the
steamer, that some alarm should exist on board of the schooner, and even if
the change of course was in a direction that contributed to the disaster, which is
doubtful, the fault must be attributed to the steamer.

The river at the place of the collision being four to five miles wide, there was no
excuse for the steamer in her near approach to the schooner in passing her.

*Southern District of New York in Admiralty.*
*Before Hon.* SAMUEL NELSON, *Associate Justice of the Su-*
*preme Court of the United States.*

THIS case came up on appeal from a decision rendered by
Hon. WM. D. SHIPMAN, sitting as district judge, in the

district court for the southern district of New York, dismissing the libel. The libel in the district court was one for a collision filed by the owners of the schooner Mary C. Town, against the steamship The Western Metropolis.

The collision took place on the the Potomac River, in February, 1864, and resulted in the sinking of the schooner. In the libel the following faults were charged against the steamer, viz:

1. That the steamer did not keep on her original course but kept closing in on the track of the schooner, so that she was aiming in a direction to cross the schooner's bow.

2. When five hundred yards off, and so closing on the schooner's course, the steamer suddenly blew one whistle, a signal usually given to sailing vessels to go to the right, and instead of following her signal, the steamer starboarded her helm and came right down on the schooner.

3. If the steamer had slowed, stopped and backed in time, and ported her helm instead of starboarding, or had, at time of blowing her whistle, ported her helm instead of starboarding, or if steamer had slowed, stopped, and backed in time, or even slowed or stopped her headway a reasonable time before the collision, the same would have been avoided.

4. If the steamer had refrained from blowing her steam whistle as a signal to schooner, to go to the right, and had ported instead of starboarding her helm, collision would have been avoided. It further charged that besides the aforesaid faults, the collision was the result of the inexperience and mismanagement of the captain of the steamer who persisted in starboarding the helm of the steamer after his mate, who was on the lookout, had warned him it was proper to put his helm a port.

The libel further averred: that the libelant's vessel did not alter her course at all until after the steamer had blown her steam whistle, and then only to avoid the collision, she put her helm up in the wind, the result of which was she came

near escaping the blow of the steamer; but if the schooner had not done so, she would have hit steamer, and probably sunk her.

The answer of the claimants took issue on the charges of negligence, and alleged that they blew a whistle as a warning to the schooner, to call her attention to the steamer then approaching her, but, notwithstanding that warning, the schooner as she approached the steamer, crossed the track of the steamer, and although then everything was done by the steamer, the collision could not be avoided. The answer did not state on what course the schooner was on, whether to starboard or larboard of steamer, before whistle was blown, but they allege the steamer was on the southerly side of the channel, and had slowed for the purpose of anchoring.

Before answering, the claimants excepted to the sufficiency of the libel. Those exceptions were argued and overruled by his Hon. Judge BETTS, and are reported in 28 *How. N. Y. S. C. P. Rep. p. 383.*

The following facts were fully proven or undisputed:

That the wind was propelling the schooner seven or eight knots on that night and was blowing from the northward.

That the tide was ebb, and flowing at the rate of two and a half knots an hour.

That the schooner was coming down the river on a course S. E. by E., one-half east. The steamer going up the river on a course N. W., as the captain said, or N. W. by W., as one of their seamen said, or from E. S. E. as the captain of of the schooner said. This latter course would point to W. N. W.

That the schooner was struck on the port side, abaft of her main chains and sunk in a very short time.

That the night was sufficiently clear to see objects at the distance off of two miles.

At the place of the collision, the river was four to five miles wide, or thereabouts.

No other vessel was in the way.

The steamer was over 2,500 tons burden, the schooner only 142 tons.

The steamer was a transport in government service.    The schooner was going down light.

The schooner's people saw the steamer four miles off; the steamer's pilot saw the schooner two miles off.

A whistle was blown by the steamer as a signal to the schooner, when the latter was a very short distance from the steamer—not over 500 yards.

The schooner at some short period after the whistle was blown ported her helm.

The steamer after blowing her whistle, or simultaneously therewith, starboarded her helm, and then ported it.    The steamer's pilot thought she had not steerage way, and this porting did not take effect.

After the schooner had ported her helm, the steamer suddenly rung her bell to stop and back her engine; her engineer said he had got her back three revolutions, and was on the fourth, when the collision took place.

Between the time the pilot of the steamer saw the schooner and the time the whistle was blown, the steamer kept on a course for the schooner, not diminishing her speed, which the libelant's witnesses say was ten to twelve miles an hour.    Those on the steamer say it was five knots per hour.

The schooner had at and before the collision, a good look-out.

The cause was argued in the district court and also on this appeal by

> DENNIS McMAHON, *advocate for the libelants (owners of schooner)*, and by .
>
> CHARLES DONOHUE, *advocate for the claimants (owners of the steamship).*

The district judge (SHIPMAN, D. J.), delivered an opinion, dismissing the libel with costs.   On appeal this decision was reversed by Judge NELSON, who delivered the following opinion:

*By the circuit court*—NELSON, Circuit Judge:   The collision in this case occured between the steamer Western Metropolis and the schooner Mary C. Town, about eight o'clock on the evening of the 10th of February, 1864, on the Potomac, a few miles above Blackstone Island and light-house.   The steamer was coming up the river, and schooner going down—the wind northerly, so that she had it nearly free —moving at the rate of about eight knots an hour; the steamer at half speed, intending soon to anchor—about five knots.   The night was not dark, the steamer having been seen some four or five miles ahead, by the hands on the schooner, and the schooner, some one and a half or two miles (though there is some diversity of opinion among the hands on board), by the steamer.   Each vessel, however, saw the other in time to adopt and follow out proper measures to avert the disaster.   As it was the duty of the steamer to take care of the schooner, and avoid her in passing, assuming that she kept her course, the *onus* rests upon the steamer to show that she did not keep it, or some other fault that contributed to the collision.   This she has undertaken, and insists that the schooner changed her course as the two vessels approached each other, and thereby defeated the movement of the steamer, to pass her in safety by starboarding her helm, and passing under her (the schooner's) stern, the latter porting about the same time and giving way in the same direction.

The whole defense turns upon this position.   The court below found the schooner in fault, and dismissed the libel on this ground.   After the best examination we have been able to give the case, we regret to say we cannot concur in this opinion.   We are forced to the conclusion that this

movement of the schooner was made under impending danger, and *in extremis*, and for which the steamer must be held responsible. The clear weight of the proof is, that the steamer was within three hundred to four hundred yards of the schooner, when the latter ported her helm, and nearly dead ahead. The combined speed of the two vessels was about twelve or fourteen miles an hour. They must have come together in one and a quarter minutes, and less than two, after the change of course of the schooner. There were five hands on the schooner, including the master, who were all on deck and witnessed the collision, and who maintain this account of it. In addition to this, there are five of the hands on board of the steamer, including the pilot, who have been examined for the libelants, and confirm it; so do the master, second mate, and wheelsman of the steamer, examined by the claimants. The master, Hilton, says the schooner was a mile, more or less off, when he discovered her, would not name the distance; that it was a very short time afterwards (would not say how short), the collision occurred; and further that it occured a very short time after the schooner changed her course—would not say how short —although pressed by the counsel for the libelants. This master seems to have been quite uninformed as to his duties. He says, if two vessels, one a steamer, the other a sailing vessel, are approaching head and head, it is the duty of each to port and go to the right, and that there is no distinction between a steamer and sailing vessel, and two steamers as to the duty. The second mate, Cowen, says, he went up on the forecastle, on hearing the schooner reported, that he then first saw her, that it was about five minutes after he saw her the collision occurred; that the schooner was about a quarter of a mile off when he first saw her, that she was very close when she crossed the steamer's bows, and he adds, "as near as I can judge, she (the schooner) was not more than the length of our ship, two hundred and fifty or three hundred feet off, when she altered her course." Again, he re-

peats in answer to the question.: About how far was the schooner from you when she commenced to put her helm to port? I judge, somewhere between two hundred and fifty or three hundred feet. The quarter-master, Kain, who was at the wheel, says, the schooner was a very short distance off when he first saw her; that the master blew the whistle a very short time after this. And to the question: How long was it after blowing the whistle that the schooner kept away? he answered right away: How soon? quick as thought! "She had not kept away before that, had she?" "No, sir." The same witness states: "I put the wheel hard a starboard by his (captain's) orders." "Before, or after the whistle blew?" "Immediately after whistle blew."

Now this testimony strongly corroborates the account of the collision, given by the hands on the schooner. To them the steamer appeared approaching nearly ahead, and as she approached them without any indication of a change of course it is not surprising that some alarm should exist on board the schooner. The master of the latter says, in this state of anxiety, and when a collision seemed almost inevitable, he heard the whistle of the steamer blow one long blast, which he took to mean, or indicate that the schooner should go to the right, and he immediately ported her helm and bore away. Now at this point of time, the hands on the schooner say, the steamer was only some three hundred or four hundred yards off. The master of the steamer says, that the collision was a very short time after the change of the course of the schooner. The second mate of the steamer says that the schooner was only two hundred and fifty or three hundred feet off when the change took place, and the quarter-master, the wheelsman, that the schooner did not change her course till after the captain blew the whistle. This witness also says that the schooner was but a very short distance off when he first saw her, that the whistle was blown a very short time after this, that it was still later

when the schooner first changed her course, that he did not starboard her helm, and of course made no change in the course of the steamer, till after the whistle was blown. The pilot of the steamer agrees with the hands on the schooner, that the latter was not over three hundred yards off when she changed her course, and according to this account of the transaction, the schooner, when her light was first discovered, was supposed by him and the captain to be a vessel at anchor, and that they steered directly towards her, till they discovered that she was under way, when they starboarded the helm.

Upon the whole we feel a very strong conviction upon the evidence that the steamer had approached so near the schooner before her change of course, that there was not only a well grounded fear for a collision, but there was actual danger of it. This must be so whether we regard the weight of it as establishing the distance at three hundred or four hundred yards, at the time of the change, or a very short time after the schooner changed her course (according to the master of the steamer and some of the hands), or some two hundred and fifty or three hundred feet off as stated by the quarter-master and wheelsman. It is not surprising (when we take into account the disparity in the size and momentum of these vessels—the steamer of 2,500 tons and the schooner 150—that the approach to each other, within three hundred or four hundred yards distance, which at the combined speed of the vessels, they would meet in less than two minutes, or according to the distance as fixed by the wheelsman of the steamer, within about as many seconds, that some alarm should exist on board the schooner, and even if the change of course was in a direction that contributed to the disaster, which is doubtful, the fault must be attributed to the steamer.

The river at the place of collision is from four to five miles wide; there was therefore no excuse for the steamer in her near approach to the schooner in passing her. There

was abundance of room clear of all obstructions, to have passed, giving to her a wide berth.   The truth seems to be that the schooner was not discovered by the steamer till very near her.   The master would not say a mile off, though strongly pressed; some of the hands say half a mile; although the evening was not dark, and a vessels lights could have been seen two or three miles without difficulty.   Some ill feeling  seem to have existed between the master and the pilot; both according to the proofs, were engaged in giving orders at the time of the disaster, and the master strongly intimates that the pilot was incompetent.   Still the wheelsman says he took orders from the pilot, and the lookout, that he communicated with the same, and even the master, Hilton, says he obeyed his orders.   The decree below reversed, and reference to acertain damages.